1   **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                      **FOR THE DISTRICT OF ARIZONA**

8

9   United States of America, ex rel. Gregory        No. CV-18-8040-PCT-DGC
    Kuzma,
10                                                     **ORDER**
                    Plaintiff,
11
    v.
12
    Northern Arizona Healthcare Corporation,
13  et al.,

14                  Defendants.

15

16       Relator Gregory Kuzma alleges that Defendants Northern Arizona Healthcare

17  Corporation ("NAHC"), Northern Arizona Healthcare Foundation ("NAHF"), and

18  Flagstaff Medical Center, Inc. ("FMC") violated the False Claims Act ("FCA"), 31

19  U.S.C. § 3729, *et seq*.  Doc. 35.  Defendants move to dismiss the amended complaint

20  pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. Docs. 37

21  (NAHC and FMC), 39 (NAHF).  The motions are fully briefed (Docs. 38, 40, 43-46), and

22  the Court held oral argument on September 25, 2020.  While the Court finds that Relator's

23  allegations state a plausible theory under the FCA, Relator has failed to plead with the

24  particularity required by Rule 9(b).  The Court will grant the motions to dismiss without

25  prejudice and allow Relator to amend his complaint.[1]

26  _____

27       [1] Relator has filed a separate complaint against NAHC, FMC, and an additional
    Defendant (Northern Arizona Orthopedic Surgery Center, LLC) alleging unrelated FCA
28  violations arising out of the purchase of a surgery center.  Doc. 40 (No. 18-cv-8041).  The
    Court will also issue an order granting the motion to dismiss that case with leave to amend.

I.      **Background.**

    A.      **Regulatory Framework.**

Medicaid is a healthcare assistance program jointly financed by the federal government and the states, and administered by the states in accordance with federal regulations.  Doc. 35 ¶ 21.  Arizona's Medicaid program is administered by the Arizona Health Care Cost Containment System ("AHCCCS"), a state agency.  *Id.* ¶ 23; *see* A.R.S. § 36-2901, *et seq.*  The federal government funds a portion of Medicaid expenditures – a portion called the Federal Financial Participation ("FFP").  *Id.* ¶ 22.

For state contributions to prompt the receipt of FFP payments under federal law, the state contributions generally must consist of state or local public funds rather than donations from private health care providers such as hospitals.  *See* 42 U.S.C. § 1396b(w)(1)(A); 42 C.F.R. § 433.54.  Provider-related donations are permitted if they are "bona fide," meaning they have no "direct or indirect relationship" to Medicaid payments the provider receives from the state or local government.  *See* 42 U.S.C. § 1369b(w)(2)(B); 42 C.F.R. § 433.54(a). Provider donations have a "direct or indirect relationship" to Medicaid payments if the donations are returned to the provider under a "hold harmless" arrangement.  *Id*. § 433.54(b).  Such an arrangement occurs where: (1) the state or other unit of government provides for a direct or indirect Medicaid payment to the provider or others making the donation, and the payment amount is positively correlated to the donation; (2) all or any portion of the Medicaid payment to the donor varies based only on the amount of the donation, including where the Medicaid payment is conditioned on receipt of the donation; or (3) the state or other unit of government receiving the donation provides for any direct or indirect payment, offset, or waiver that directly or indirectly guarantees to return any portion of the donation to the provider or other parties responsible for the donation.  *Id*. § 433.54(c)(1)-(3).  If a provider-related donation falls within one of these hold harmless definitions, and therefore is not "bona fide," the Centers for Medicare & Medicaid Services ("CMS") – the federal agency that administers the

Medicaid program – will deduct the amount of the donation from the FFP the state receives. Doc. 35 ¶ 28; 42 C.F.R. § 433.54(e).

A state may fund its share of Medicaid and prompt the payment of FFP from the federal government through an Intergovernmental Agreement ("IGA").  *See* 42 U.S.C. § 1396b(w)(6)(A)-(B).  An IGA is an agreement between the state Medicaid administrator (in Arizona, AHCCCS) and a qualifying public entity, under which the public entity transfers public funds to the Medicaid administrator for the state's share of Medicaid. Doc. 38 at 3.[2]

The restrictions on non-bona fide provider-related donations include not only donations made by a provider to the state administrator, but also donations made by a provider "to an organization, which in turn donates money to the State." *Id.* § 433.52(4)(1). Thus, any funds transferred by a qualifying public entity to AHCCCS pursuant to an IGA, which AHCCCS then uses to claim FFP funds, cannot come from non-bona fide provider-related donations.  *See* 42 U.S.C. § 1396b(w)(6)(A) (allowing IGA transfers "unless the transferred funds are derived by the unit of government from donations or taxes that would not otherwise be recognized as the non-federal share"); 42 C.F.R. § 433.54(b).

AHCCCS may pay its share of Medicaid, plus the corresponding FFP, to a qualifying hospital through the Disproportionate Share Hospital program ("DSH").  This program provides supplemental Medicaid payments to hospitals that serve a disproportionate share of uninsured individuals.  *See generally* 42 C.F.R. § 412.106.

### B. Relator's Allegations.

The Court takes the factual allegations of Relator's amended complaint as true for purposes of the motions to dismiss.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Relator worked for NAHC as its vice president and chief financial officer from 2004 to 2014. Doc. 35 ¶¶ 7-8.  Since 2016, Relator has been employed as the chief financial officer of North Country HealthCare ("North Country"), a private nonprofit health center that is a

---

[2]  Citations are to page numbers placed at the top of each page by the Court's electronic filing system, not to original page numbers on the documents.

tenant in a building owned by the Williams Hospital District ("WHD"), a state entity. *Id.*
¶¶ 9, 37.

In 2015, WHD asked NAHC to consider donating $3 million to fund the construction of a new medical building, matching the amount WHD had collected through a tax assessment. *Id.* ¶¶ 38-39. NAHC declined, and instead proposed that WHD pursue a matching contribution under an IGA. *Id.* ¶ 40; *see* A.R.S. § 11-952. NAHC and FMC held discussions with WHD regarding the proposed IGA and related transactions for approximately one year, during which time NAHC formed NAHF, a nonprofit entity. *Id.* ¶¶ 12, 47-48. NAHF was formed in part to facilitate the series of transactions discussed below between NAHC, FMC, and WHD. *Id.* ¶ 48.

Relator became aware of the discussions between Defendants and WHD while working for North Country and expressed concern about the legality of the proposed transaction. *Id.* ¶¶ 49, 51. Relator had previously discussed the federal prohibition on recycling of Medicaid funds with Rick Smith, a former NAHC employee who in 2016 became the president and CEO of NAHF. *Id.* ¶ 52. Smith explained that FMC was considering participating in an IGA to obtain Medicaid funds, and Relator replied that there were insufficient state and local funds to legally pursue the Medicaid opportunity. *Id.* ¶ 53.

In August 2016, Relator expressed his concern about the proposed funding arrangement to a North Country colleague who was present for some of the ongoing discussions between Defendants and WHD, and suggested that his colleague request a "flow of funds" of the transaction at the next meeting. *Id.* ¶¶ 54-55. According to Relator's colleague, when asked for the flow of funds at the meeting, Jennifer Hidinger, an NAHC employee who acted on behalf of all Defendants in the discussions, said "we can't put anything in writing." *Id.* ¶ 56.

On February 1, 2017, WHD entered into an IGA with AHCCCS. *Id.* ¶ 58; Doc. 38-1 at 8. Attachment B to the IGA was an "Agreement to Reimburse Impermissible Disproportionate Share Hospital Payments" signed by FMC as the hospital that would receive the DSH payment. *Id.* at 10. The agreement required FMC to refund the DSH

payment if it was determined that the source of the funds was not permissible under federal law.  *See id.*  Neither NAHC nor NAHF were parties to the IGA or signatories to its attachments.  *Id.*

Pursuant to the IGA, WHD transferred $2.2 million to AHCCCS and represented that the funds constituted the non-federal share of a DSH payment to be made to FMC. Doc. 35 ¶ 58.  AHCCCS then requested and received $4,757,270 of FFP from the federal government, and transferred the total received from WHD and the federal government ($6,975,270) to FMC as a DSH payment.  *Id.* ¶ 59.  FMC in turn transferred $6 million of this amount to NAHF, and NAHF gave a $6 million grant to WHD.  *Id.* ¶¶ 58-60.  Relator alleges that this series of transactions had the effect of returning the original $2.2 million that WHD had provided to AHCCCS, plus an additional $3.8 million.  *Id.* ¶ 60.  FMC retained approximately $975,000.  *Id.* ¶¶ 60, 62.

Relator filed this action on February 28, 2018.  Doc. 1.  Two years later, the United States notified the Court of its decision not to intervene.  Doc. 19.  Relator amended his complaint after conferring with Defendants about their planned motion to dismiss. Docs. 30, 35.  The amended complaint alleges that Defendants violated the FCA by implementing the series of transactions described above.  Doc. 35.  Relator further alleges that Defendants violated the FCA by failing to reimburse Medicaid for the impermissible DSH payment to FMC.  *Id.*

## II.    Relevant Legal Standards.

When analyzing a complaint for failure to state a claim to relief under Rule 12(b)(6), the well-pled factual allegations are taken as true and construed in the light most favorable to the nonmoving party.  *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).  A successful motion to dismiss under Rule 12(b)(6) must show either that the complaint lacks a cognizable legal theory or fails to allege facts sufficient to support its theory.  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  A complaint that sets forth a cognizable legal theory will survive a motion to dismiss as long as it contains "sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Because FCA claims involve allegations of fraud, they must comply with the heightened pleading requirements of Rule 9(b). *Cafasso ex rel. United States v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054-55 (9th Cir. 2011). That rule requires a party alleging fraud to "state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b). A "pleading must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Cafasso*, 637 F.3d at 1055 (internal quotation marks omitted). Rule 9(b) serves dual purposes: (1) to give defendants fair notice of the allegations of fraud so they have an opportunity to rebut specific accusations; and (2) to deter the harm caused by unsubstantiated fraud complaints. *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016).

## III. Discussion.

Relator alleges violations of 31 U.S.C. § 3729(a)(1)(A) and (B), which create liability for any person who "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." The elements of § 3729(a)(1)(A) and (B) are "virtually identical, with the only difference being whether Defendants submitted a false claim or made a statement material to such a claim[.]" *McGrath v. Microsemi Corp.*, 140 F. Supp. 3d 885, 894 (D. Ariz. 2015), *aff'd*, 690 F. App'x 551 (9th Cir. 2017) (citation omitted). The Court must interpret the FCA "broadly, in keeping with Congress's intention to reach all types of fraud, without qualification, that might result in financial loss to the Government." *Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr.*, 953 F. 3d 1108, 1116 (9th Cir. 2020) (quoting *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968)). As a result, FCA liability is not limited to those who present false claims to the government, but includes "any person who knowingly *assisted* in causing the government to pay claims which were grounded in

fraud without regard to whether that person had direct contractual relations with the government." *U.S. v. Mackby*, 261 F.3d 821, 827 (9th Cir. 2001) (quoting *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537, 544- 45 (1943)) (emphasis in *Mackby*). A defendant may be liable if it pursues a scheme that would ultimately result in the submission of a false claim, even if the defendant did not participate in actual submission of the claim. *U.S. v. Bornstein*, 423 U.S. 303, 309 (1976); *Hess*, 317 U.S. at 543-45; *U.S. ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 243-44 (3d Cir. 2004).

Relator also alleges a violation of the FCA's reverse false claims provision. Doc. 35 ¶¶ 67-80. That provision creates liability for one who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G); *see United States ex rel. Kelly v. Serco*, *Inc*., 846 F.3d 325, 335 (9th Cir. 2017).

### A.     NAHC and FMC's Motion to Dismiss (Doc. 37).

Defendants NAHC and FMC argue that Relator's amended complaint does not adequately allege a violation of the FCA under an implied certification theory in Counts 1 and 2, and does not adequately plead a reverse false claim in Count 3. The Court will address these arguments separately.[3]

### 1.     Counts 1 and 2 – Implied Certification.

To state a claim under 31 U.S.C. § 3729(a), Relator must allege that: (1) the defendant presented or caused to be presented to an agent of the United States (2) a claim for payment (3) that was false or fraudulent, (4) with knowledge that the claim was false

---

[3] NAHC and FMC attach a copy of the IGA and two related letters as exhibits to their motion. *See* Docs. 38-1, 38-2, 38-3. They assert that the Court may review documents forming the basis of Relator's claims without converting the motion to dismiss into one for summary judgment. Doc. 38 at 3 n.1 (citing *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999, 1002 (9th Cir. 2018), *cert denied sub nom Hagan v. Khoja*, 139 S. Ct. 2615 (2019)). Relator does not object. *See* Doc. 44. The Court will consider the exhibits without converting the motion.

or fraudulent, and (5) the falsity was material to the government's payment decision. *United States v. Corinthian Colleges*, 655 F.3d 984, 992 (9th Cir. 2011). Under an "implied certification" approach to the FCA, liability can arise "when an entity has previously undertaken to expressly comply with a law, rule, or regulation, and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim." *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010). To assert the implied certification theory, two conditions must be met: "first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements make those representations misleading half-truths." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2001 (2016).

Relator alleges that Defendants violated the FCA under an implied certification theory "because NAH[C] and FMC failed to disclose violations of the Medicaid statute and regulations regarding non-bona fide donations that they were required to comply with as a prerequisite to the Government's payment of matching federal funds." Doc. 44 at 12-13 (citing *United States ex rel. Baker v. Comm. Health Sys.*, No. 05-279 WJ/WDS, 2010 WL 11431465, at * 11-12 (D.N.M July 7, 2010)). Relator also alleges that "FMC knowingly entered into an IGA for the sole purpose of securing federal matching funds that it could recycle through NAHF back to WHD." Doc. 35 ¶ 62.

### a.    Is A Violation Alleged?

NAHC and FMC argue that "even assuming the truth of [Relator's] allegations . . . Relator has not alleged that the DSH payment FMC received resulted from a non-bona fide provider donation." Doc. 38 at 7. They further contend that Relator's complaint ignores *Escobar*'s two requirements for asserting an implied certification theory. NAHC and FMC make several arguments in support.[4]

---

[4] NAHC and FMC's reply brief arguments are structured quite differently than their motion, making it difficult for the Court to keep track of all their assertions. *Compare* Docs. 38, 45. This order primarily will follow the organization of the reply brief.

First, although Defendants raised it only in a footnote in their motion (Doc. 38 n.7), they contend that 42 U.S.C. § 1396b(w)(1)(A) – which requires the federal government to reduce a state's share by the amount of any non-bona fide provider-related donations before calculating the federal share – does not apply to Arizona.  Docs. 38 at 7 n.7, 45 at 3-4.  NAHC and FMC cite the definition of "State" in § 1396b(w), which "does not include any State whose entire program under this subchapter is operated under a waiver granted under section 1315 of this title."  42 U.S.C. § 1396b(w)(7)(D); 42 U.S.C. § 1315 (implementing provision as § 1115(a) of the Social Security Act); *see also Spry v. Thompson*, No. CV-03-121-ST, 2003 WL 23411996, at *13 (D. Or. Dec. 8, 2003), *aff'd in part, rev'd in part*, 487 F.3d 1272 (9th Cir. 2007) (noting that according to § 1396b(w)(7), this definition applies only to subsection § 1396b(w)).

But NAHC and FMC have not presented, and the Court has not found, any authority suggesting that because AHCCCS operates under a series of § 1115 waivers, Defendants are not required to comply with federal regulations governing DSH payments.  Although it appears to be true that § 1115 waivers were in place at all relevant times,[5] the Court is not convinced that Arizona's "entire" Medicaid program is covered under a waiver as required by the statute.  *See* 42 U.S.C. § 1396b(w)(7)(D).  AHCCCS's waiver specifies that funding must not be "derived from an impermissible source, including *recycled Medicaid payments*, federal money precluded from use as state match, impermissible taxes, and *non-bona fide provider-related donations*."  Centers for Medicare and Medicaid Services Waiver List, Nos. 11-W-00275/09, 21-W-00064/9 (Arizona Medicaid Section 1115 Demonstration) at 50 (emphasis added).[6]  The waiver list also makes clear that "[a]ll Medicaid . . . Program requirements expressed in law, regulation, and policy statement not expressly waived or identified as not applicable in this list, shall apply to the demonstration

---

[5] Medicaid.gov, Arizona Health Care Cost Containment System, https://www.medicaid.gov/medicaid/section-1115-demo/demonstration-and-waiver-list/80976 (last visited August 26, 2020) (waivers effective 10/22/2011 and expiring 9/30/2021).

[6] Centers for Medicare and Medicaid Services, Waiver List, https://www.azahcccs.gov/Resources/Downloads/WaiverAnd%20ExpenditureAuthoritiesAnd%20STCs.pdf (last visited August 26, 2020).

project beginning October 1, 2016 through September 30, 2021, unless otherwise specified." *Id.* at 1.  It would appear that § 1396b(w)(1)(A) is not expressly waived and applies to Arizona.

Relator points to two documents that appear to acknowledge this.  The CMS memo to State Medicaid Directors states specifically that a donation is not considered bona fide where an arrangement is "tied *in any way*, directly or indirectly, to Medicaid reimbursement under the Medicaid state plan."  Doc. 38-3 at 5 (emphasis in original).  Similarly, AHCCCS's 2010 memo to hospital systems in Arizona, including NAHC and FMC, specifically alerts them to the limitations on provider-related donations, including a prohibition on non-bona fide provider-related donations.  *See* Doc. 38-2 at 2-5.  Consistent with these requirements, Attachment B to the IGA, signed by FMC, provides that "no portion of the funds transferred to AHCCCS are derived from [] direct or indirect provider-related donations (in cash or in kind), other than bona fide provider-related donations."  Doc. 38-1 at 5.  NAHC and FMC's argument is not persuasive on this record.

Second, NAHC and FMC argue that the amended complaint "does not adequately allege that a non-bona fide provider-related donation was used to obtain matching federal funds."  Docs. 38 at 6-10, 45 at 4-7.  Relator contends that WHD's transfer was impermissible because it was indirectly linked to the donation FMC made to NAHF after FMC received DSH funds, and to the charitable grant NAHF then made to WHD for construction of a new health clinic.  Doc. 35 ¶¶ 4, 62.  Relator characterizes these transactions as "recycling" federal funds.  *Id.*  NAHC and FMC contend that there is no concern about recycling funds because the initial source of the funding was WHD and not a health care provider.  Docs. 38 at 8-10, 45 at 5.  The Court is not persuaded.

Construing the evidence in the light most favorable to Relator, the amended complaint alleges that FMC indirectly funded the $2.2 million local share needed to obtain the FFP funds.  *Cousins*, 568 F.3d at 1067.  Specifically, the amended complaint alleges that FMC, after receiving a $6.975 million federal DSH payment, transferred at least $6 million to NAHF, and that NAHF – an entity created by NAHC partly to facilitate this

transaction – then made a $6 million grant to WHD.  Doc. 35 ¶¶ 48, 54-64.  Relator alleges that this $6 million reimbursed WHD's original $2.2 million contribution and provided an additional $3.8 million in recycled federal Medicaid dollars.  Doc. 44 at 15.  Relator alleges that these transactions occurred pursuant to a fraudulent scheme hatched between NAHC, FMC, NAHF, and WHD to ensure that WHD would recoup its original donation through a provider-related donation, and that Defendants would benefit from the $975,000 retained by FMC and the good publicity associated with a grant to WHD.  Doc. 35 ¶¶ 47-63.

The Court cannot conclude that this alleged scheme does not involve the "indirect" payment of WHD's $2.2 million contribution by FMC.  Relevant regulations specifically state that "[d]onations made by a health care provider to an organization, which in turn donates money to the State, may be considered to be a donation made indirectly to the State by a health care provider."  42 C.F.R. § 433.52(4)(1).

FMC and NAHC argue that Relator's alleged scheme has incorrect timing – that WHD's $2.2 million contribution would be improper only if FMC paid that amount to WHD before WHD transferred it to AHCCCS.  In support, NAHC and FMC cite 42 U.S.C. § 1396b(w)(6)(A), which disallows FFP payments when "the transferred [state] funds are *derived by the unit of government from donations* or taxes that would not otherwise be recognized as the non-Federal share under this section." (Emphasis added.)  They also cite 42 C.F.R. § 433.52(4)(1), which states that "[d]onations made by a health care provider to an organization, which *in turn* donates money to the State, may be considered to be a donation made indirectly to the State by a health care provider."    (Emphasis added.)  Defendants argue that these laws include a temporal requirement – that funds transferred by WHD to AHCCCS can be "derived" from an improper source only if the improper source first transfers the funds to WHD, and that the words "in turn" show that the donation must be made to WHD before it, in turn, donates the money to AHCCCS.  NAHC and FMC also cite § 4.5 of the IGA, which provides that FMC "will receive and retain one hundred percent (100%) of all DSH payments and, except as provided in this Agreement or as required by federal law or regulatory authority," is "not required to *return* any portion

of the DSH payment to the State, AHCCCS, or the public entity." Doc. 38-1 at 4 (emphasis added).  They argue that the reference to "return" of the funds implies that FMC has made the donation before receiving the DSH payment.

Although the wording identified by NAHC and FMC provides some support for their position, the Court concludes that these words cannot support the full weight of Defendants' argument at this stage of the litigation.  First, Defendants cite no case law supporting this interpretation.  Second, Defendants' narrow reading would allow a health care provider to pay for WHD's contribution to AHCCCS, under an intentional hold harmless arrangement and contrary to the clear intent of the statute and regulations, by the simple expedient of providing the donation to WHD after the DSH funds are received rather than before.  The Court cannot conclude that the law permits so easy an end-run around its intent.  Third, as noted above, the Ninth Circuit has instructed the Court to interpret the FCA "broadly, in keeping with Congress's intention to reach all types of fraud, without qualification, that might result in financial loss to the Government."  *Winter*, 953 F. 3d at 1116 (citation omitted).

As Defendants themselves acknowledge:  "Given the restriction on non-bona fide provider-related donations, . . . a hospital cannot donate its own funds to a public entity that the public entity donates to AHCCCS in order to obtain Medicaid payments for the hospital."  Doc. 38 at 3.  That is precisely what Relator alleges happened in this case.  Relator "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable" for indirectly funding the $2.2 million local share needed to obtain the FFP funds that were paid to FMC and eventually found their way back to WHD.  *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

Third, NAHC and FMC argue that Relator does not adequately allege the existence of a "hold harmless" arrangement between FMC and WHD.  Docs. 38 at 8-9, 45 at 7.  As the relevant regulation states, a "hold harmless" arrangement exists where: (1) the state or other unit of government provides for a direct or indirect Medicaid payment to the provider or others making or responsible for the donation, and the payment amount is positively

correlated to the donation; (2) all or any portion of the Medicaid payment to the donor varies based only on the amount of the donation, including where the Medicaid payment is conditioned on receipt of the donation; or (3) the state or other unit of government receiving the donation provides for any direct or indirect payment, offset, or waiver that directly or indirectly guarantees to return any portion of the donation to the provider or other parties responsible for the donation.  42 C.F.R. § 433.54(c)(1)-(3).  Relator alleges that there is a positive correlation between FMC's direct receipt of Medicaid funds and its reimbursement of WHD's donation to AHCCCS, that FMC's receipt of Medicaid funds was conditioned on its agreement to reimburse WHD for the $2.2 million, and that FMC was guaranteed in this scheme to receive all of the funds through Medicaid that it would channel to WHD through NAHF.  Doc. 35 ¶¶ 30-31, 58-63.

The Court declines to dismiss Counts 1 and 2 on the ground that the scheme alleged in the amended complaint does not violate the provider-donation requirements of the Medicaid statutes and regulations.  FMC and NAHC also argue that the amended complaint fails to allege facts sufficient to support scienter.  Doc. 45 at 10.  The Court rejects this argument for the reasons stated below in the discussion of NAHF's arguments.

### b.    Rule 9(b).

The Court agrees with Defendants' argument that Relator has failed to allege the elements of an implied certification claim.  As noted above, two conditions must be met: "first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements make those representations misleading half-truths." *Escobar*, 136 S. Ct. at 2001.  As will be discussed more fully below, the amended complaint fails clearly to identify the false claim made in this case, and certainly does not identify any "specific representations" the claim contained.  Nor does the amended complaint explain why the false claim's omissions made the specific representations misleading half-truths.  This conclusion could be reached under either

Rule 9(b) or 12(b)(6), and is sufficient for dismissal of Counts 1 and 2.  The Court nonetheless will also address NAHC's and FMC's specific Rule 9(b) arguments.

A "pleading must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false."  *Cafasso*, 637 F.3d at 1055 (internal quotation marks omitted).  Defendants correctly argue that a false claim is central to an FCA violation, and yet the amended complaint does not clearly identify the false claim at issue in this case.  It "does not describe who made any submission to the federal government, when the submission was made, what the content or form of the submission was, or how the submission was evaluated by the federal government (materiality)."  Doc. 38 at 12.  Nor does it identify the falsity in any submission.

The amended complaint alleges that AHCCCS sought FFP funds from the federal government, but does not identify this act as the false claim.  Doc. 35 ¶ 59.  It alleges that the IGA was "fraudulent," and asserts that FMC "participated" and "entered into" it, but does not clearly explain how the IGA was fraudulent or how this falsity was communicated to the federal government.  *Id.* ¶¶ 61-62.  It asserts that "false and fraudulent claims" were made "by WHD, AHCCCS and/or FMC for payment of $4.775 [sic] in federal Medicaid funds," but does not say when, how, what these claims said, or why they were false.  *Id.* ¶ 68.  It alleges that "Defendants" used or made "false records or false statements material to the foregoing [unidentified] false claims," but does not describe the records or statements.  *Id.* ¶ 73.  Later, it says the false records and statements "include, but are not limited to, the fraudulent IGA entered into by FMC," but again fails to describe how the IGA was false and fraudulent.  *Id.* ¶ 75.

NAHC and FMC also correctly argue that "Relator does not include particularized allegations" against all Defendants.  Doc. 38 at 13.  Rule 9(b) requires that fraud be pled with specificity as to each Defendant.  *Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007).  The amended complaint does contain allegations about NAHC and FMC's involvement in the alleged scheme.  Doc. 35 ¶¶ 54-64.  FMC participated in the IGA to

secure the $4.775 million in FFP that it then granted to WHD through NAHF, and the grant was not NAHF's money, but rather funds the federal government had provided to FMC. *Id.* ¶ 61.  Further, FMC operates NAHC's flagship hospital, NAHC created NAHF in June 2016 with a reversionary interest back to NAHC, NAHC created NAHF in part to serve as an intermediary to facilitate the transfer of FMC's DSH funds to WHD through a $6 million grant, and all three Defendants engaged in discussions regarding the fraud.  *Id*. ¶¶ 11-12, 47-48, 60-62.  But the amended complaint says nothing about false claims or statements made by FMC and NAHC, or specify how they otherwise assisted in some other entity's submission of a false claim.

The Court will grant NAHC and FMC's motion to dismiss Counts 1 and 2 for failure to plead with Rule 9(b) particularity.

### 2.    Count 3 – Reverse False Claims.

NAHC and FMC contend that Count 3 must be dismissed because it is not "critically distinct" and is "nothing more than an improper recasting of [Relator's] affirmative claims."  Docs. 38 at 15, 45 at 11.  Relator agrees that Count 3 arises out of the same scheme as Counts 1 and 2, but argues that the facts underpinning its theory of liability are distinct.  Doc. 44 at 21.  He contends that "Defendants' reverse false claim liability is rooted in their decision to avoid an obligation to return money due and owing the Government as specifically required under the IGA[.]"  *Id.*  NAHC and FMC argue that additional evidence is required for reverse false claims liability, and cite a case from the Central District of California which noted that "in cases where a plaintiff alleges a reverse false claim by claiming that the defendant fraudulently overcharged the government and then failed to repay the government, courts have consistently dismissed the claim as redundant of false statement and presentment claims."  *United States v. Kinetic Concepts, Inc.*, No. CV 08-01885-BRO, 2017 WL 2713730, at *13 (C.D. Cal. Mar. 6, 2017) (collecting cases).

In response, Relator cites an Eastern District of Wisconsin case which takes a different approach:

> [A] direct FCA violation occurs not when the person receives money from the government, but when the person makes a false claim or statement. Thus, a direct false-claim violation is complete as soon as the person submits the false claim or makes the false statement. It is not unreasonable to think that if the person later receives money from the government based on his prior false claim or statement and does not return it, he could be deemed to have committed a second FCA violation. In this situation, the person has committed two wrongful acts: (1) submitting the false claim or making the false statement, and (2) later avoiding an obligation to return money. Congress may have intended to allow the government to pursue both direct and reverse false claims under these circumstances.

*United States ex rel. Patzer v. Sikorsky Aircraft Corp.*, No. 11-C-0560 14-C-1381, 2018 WL 3518518, at *9 (E.D. Wis. July 20, 2018).

Even in *Patzer*, however, the claimant provided additional evidence – that the defendant made false statements "designed to prevent the government from obtaining repayment of the money." *Id.* And the FCA itself recognizes a reverse false claim when a defendant "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). Relator does not allege that Defendants made or used a false record or statement material to their obligation to pay money to the federal government, or explain how they knowingly concealed, avoided, or decreased such an obligation. Nor does he explain how NAHC or NAHF (which joins this motion) retained any money they were obligated to pay the federal government. Greater particularity is required, and the Court accordingly will grant NAHC and FMC's motion to dismiss Count 3.

### B.   NAHF's Motion to Dismiss (Doc. 39).

NAHF, like NAHC and FMC, argues that Relator's amended complaint does not adequately plead an FCA violation in Counts 1 and 2 or a reverse false claim in Count 3. Doc. 40 at 7. The Court agrees with the Count 3 argument for the reasons outlined above. Relator has failed to allege any evidence that NAHF acted to prevent the government from

recouping federal funds that were fraudulently obtained, or that NAHF retained such funds. The Court will grant NAHF's motion to dismiss Count 3.

### 1. Counts 1 and 2.

NAHF joins the motion to dismiss filed by NAHC and FMC in its entirety. Doc. 40 at 1. The Court has addressed that motion above, with the exception of scienter, which will be addressed below.

NAHF also contends that it cannot be liable under Count 1 because it is not a party to the IGA or its attachments. *Id.* at 7. The Court does not agree that liability under the FCA, in the scheme alleged by Relator, is limited to those who were parties to the IGA. The amended complaint alleges that NAHF was created in part as a vehicle to facilitate participation in the IGA; that NAHF and the other Defendants "assured" WHD that it could trust the legality of the transaction; and that NAHF ultimately made a $6 million grant to WHD – comprised of unlawfully obtained federal funds – to "return" WHD's original donation plus $3.8 million. Doc 35. ¶¶ 48, 54, 62. In other words, NAHF entered into a scheme with the other Defendants to facilitate the IGA between WHD and AHCCCS, despite knowing that the state's share of DSH funds would ultimately be sourced from a non-bona fide provider donation in violation of statutory, regulatory, or contractual requirements. *See id.* ¶ 45; 42 C.F.R. § 433.52. As noted above, the FCA imposes liability not only on any person who knowingly makes a false claim for payment, but also on persons who cause such a claim to be made. 31 U.S.C. § 3729(a)(1); *see also Mackby*, 261 F.3d at 827 ("[T]he FCA reaches any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government."). Relator alleges that NAHF "assisted in causing" the government to pay matching federal Medicaid funds by entering into the alleged fraudulent scheme. Doc. 35 ¶¶ 47-48; *Mackby*, 261 F. 3d at 827. That NAHF was not a party or signatory to the IGA does not shield it from liability under the FCA at this stage of the litigation. *See* 31 U.S.C. § 3729(a)(1).

### 2.    Rule 9(b).

NAHF argues that the amended complaint does not differentiate between Defendants and the role each played in the allegedly fraudulently scheme.  *Swartz*, 476 F. 3d at 764-65.  The Court reaches the same conclusion as above.  The amended complaint puts NAHF on notice of its role in the alleged scheme.  *See* Doc. 35 ¶¶ 48, 50, 52, 60, 65. But as noted above, the amended complaint fails to describe the false claim in this case, why it was false, or how the falsity was communicated to the federal government.  And it says nothing about false claims or statements made by NAHF, or how NAHF assisted in some other entity's submission of a false claim.  The amended complaint does not plead fraud with the particularity required by Rule 9(b).

NAHF also contends that the amended complaint fails to meet the FCA's scienter requirement because it "fails to allege scienter with particularity as to NAHF."  Doc. 40 at 10.  This misstates the legal standard.  Under Rule 9(b), "scienter need not be pleaded with particularity, but may be alleged generally."  *Winter*, 953 F.3d at 1022.  "A complaint needs only to allege facts supporting a plausible inference of scienter."  *Id.*[7]

The amended complaint alleges that NAHF was a vehicle used to facilitate a fraudulent scheme with NAHC, FMC, and WHD to receive FFP from the government. Doc 35 ¶ 35.  It further alleges that Relator made NAHF leadership aware that the proposed arrangement violated Medicaid regulations, and that leadership refused to provide a "flow of funds" because they wanted to avoid putting anything in writing.  *Id.* ¶¶ 53-56, 65.  This supports a plausible inference of scienter.  *Winter*, 953 F.3d at 1022.  The Court similarly finds that the allegations sufficiently allege scienter against NAHC and FMC.

### IV.    Leave to Amend.

The Court will dismiss Relator's amended complaint without prejudice and grant leave to file a second amended complaint.  *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d

---

[7] The FCA requires any false statement to have been made "knowingly."  31 U.S.C. § 3729(a)(1)(a)-(g).  The statute defines "knowingly" as acting either with actual knowledge, in deliberate ignorance of the truth or falsity of the information, or in reckless disregard of the truth or falsity of the information.  *Id.* § 3729(b)(1)(A).  There is no requirement of specific intent to defraud.  *Id.* § 3729(b)(1)(B).

1097, 1108 (9th Cir. 2003).  Relator is cautioned, however, that the Court likely will not allow a third amended complaint.  If Relator cannot plead a viable claim in three attempts, further attempts likely will be futile.

**IT IS ORDERED** that Defendants' motions to dismiss (Docs. 37, 39) are **granted**. The amended complaint is dismissed without prejudice.  Relator may file a second amended complaint within 14 days of this order.  If Defendants choose to file a motion to dismiss the second amended complaint, they shall file a single joint motion, within 14 days of the amended complaint, and shall limit the motion to 15 pages.  Relator shall file a response within 14 days, also limited to 15 pages.  Defendants shall file a reply within 7 days, limited to 8 pages.  The parties shall call the Court to advise it when briefing on the motion has been completed.

Dated this 30th day of September, 2020.

David G. Campbell
Senior United States District Judge