**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, ex rel. Gregory Kuzma, | No. CV-18-8040-PCT-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Northern Arizona Healthcare Corporation, et al., | |
| Defendants. | |

Defendants Northern Arizona Healthcare Corporation ("NAHC"), Northern Arizona Healthcare Foundation ("NAHF"), and Flagstaff Medical Center, Inc. ("FMC") have filed a motion to dismiss Relator Gregory Kuzma's second amended complaint. Doc. 60. The motion is fully briefed, and oral argument will not aid the Court's decision. Fed. R. Civ. P. 78(b); LRCiv 7.2(f). The Court will deny the motion.[1]

## I.    Background.

### A.    Procedural History.

Relator filed this action in February 2018, alleging that Defendants violated the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq*., by causing the State of Arizona to present a false claim to the federal government for payment of approximately $4.775

---

[1] Relator has filed a separate complaint against NAHC, FMC, and an additional Defendant (Northern Arizona Orthopedic Surgery Center, LLC) alleging unrelated FCA violations arising out of the purchase of a surgery center. Doc. 56 (No. 18-cv-8041). In the near future, the Court will issue an order on the motion to dismiss that case.

million in federal Medicaid funds.  Doc. 1.  Two years later, the United States declined to intervene.  Doc. 19.  After conferring with Defendants, Relator filed a first amended complaint ("FAC").  Doc. 35.  In September 2020, the Court dismissed the FAC for failure to plead with particularity under Rule 9(b) and granted Relator leave to amend.  Doc. 52. Relator filed a second amended complaint ("SAC") on October 14, 2020.  Doc. 53.

**B.    Regulatory Framework.**

Medicaid is a healthcare assistance program jointly financed by the federal government and the states, and administered by the states in accordance with federal regulations.  Doc. 53 ¶ 21.  Arizona's Medicaid program is administered by the Arizona Health Care Cost Containment System ("AHCCCS"), a state agency.  *Id.* ¶ 24; *see* A.R.S. § 36-2901, *et seq.*  The federal government funds a portion of Medicaid expenditures called the Federal Financial Participation ("FFP").  Doc. 53 ¶ 22.  Each quarter, based on a state's estimate of anticipated Medicaid expenditures, the Centers for Medicare & Medicaid Services ("CMS") – a federal agency that administers the Medicaid program – makes an advance payment of federal funds to the state.  42 C.F.R. § 430.30(a)(2).  The state draws down those funds to pay providers.  *Id*. § 430.30(d)(3).  At the end of the quarter, the state submits a Form CMS-64 ("Form-64") to CMS detailing its actual recorded Medicaid expenditures.  *Id*. § 430.30(c)(1); Doc. 53 ¶ 31.  CMS considers the Form-64 and other information in calculating the amount of federal funds awarded to the state each quarter. *See* 42 C.F.R. § 430.30(a)(2).  If CMS's advance payment exceeds the state's actual expenditures as detailed in the Form-64, the overpayment may be withheld from future advances.  *Id*. § 430.30(d)(2).  Each Form-64 requires a state to certify that "[t]he required amount of state and/or local funds were available and used to match the state's allowable expenditures included in this report, and such state and/or local funds were in accordance with all applicable federal requirements for the non-federal share match of expenditures." Doc. 53 ¶ 32.

For state contributions to trigger FFP payments under federal law, the contributions generally must consist of state or local public funds rather than donations from private

health care providers such as hospitals.  *See* 42 U.S.C. § 1396b(w)(1)(A); 42 C.F.R. § 433.54.  Provider-related donations are permitted, however, if they are "bona fide," meaning they have no "direct or indirect relationship" to Medicaid payments the provider receives from the state or local government.  *See* 42 U.S.C. § 1369b(w)(2)(B); 42 C.F.R. § 433.54(a).  To ensure that states and their local governments bear their fair share of Medicaid expenditures, and to incentivize them to monitor their Medicaid programs for waste or fraud, non-bona fide provider-related donations are prohibited.  Doc. 53 ¶¶1-2; *see also, e.g.*, 84 Fed. Reg. 63722, 63728 (Nov. 18, 2019).  All provider-related donations must be reported and documented on CMS Form-64.11 and Form 64.11A, which are part of the Form-64 package submitted by the state to the federal government.  Doc. 53 ¶ 42; *see also* 42 C.F.R. § 433.74(a).

Provider-related donations made to states are not bona fide, have a "direct or indirect relationship" to Medicaid payments, and therefore cannot properly trigger federal payments if the donations are returned to the provider under a "hold harmless" arrangement.  42 C.F.R. § 433.54(b).  Such an arrangement occurs where: (1) the state or other unit of government provides for a direct or indirect non-Medicaid payment to the provider or others making the donation, and the payment amount is positively correlated to the donation; (2) all or any portion of the Medicaid payment to the donor varies based only on the amount of the donation, including where the Medicaid payment is conditioned on receipt of the donation; or (3) the state or other unit of government receiving the donation provides for any direct or indirect payment, offset, or waiver that directly or indirectly guarantees to return any portion of the donation to the provider or other parties responsible for the donation.  *Id.* § 433.54(c)(1)-(3).  If a provider-related donation falls within one of these hold harmless definitions and therefore is not "bona fide," CMS will deduct the amount of the donation from the FFP the state receives.  *Id.* § 433.54(e).

A state may fund its share of Medicaid and prompt the payment of FFP from the federal government through an Intergovernmental Agreement ("IGA").  *See* 42 U.S.C. § 1396b(w)(6)(A)-(B).  An IGA is an agreement between the state Medicaid administrator

(in Arizona, AHCCCS) and a qualifying public entity, under which the public entity transfers public funds to the Medicaid administrator for the state's share of Medicaid. Doc. 53 ¶ 50.

The restrictions on non-bona fide provider-related donations include not only donations made directly by a provider to the state administrator, but also donations made by a provider "to an organization, which in turn donates money to the State." 42 C.F.R. § 433.52(4)(1).  Thus, any funds transferred by a qualifying public entity to AHCCCS pursuant to an IGA, which AHCCCS then uses to claim FFP funds, cannot come from non-bona fide provider-related donations.  *See* 42 U.S.C. § 1396b(w)(6)(A) (allowing IGA transfers "unless the transferred funds are derived by the unit of government from donations or taxes that would not otherwise be recognized as the non-federal share"); 42 C.F.R. § 433.54(b).

AHCCCS may pay its share of Medicaid, plus the corresponding FFP, to a qualifying hospital through the Disproportionate Share Hospital program ("DSH").  This program – known in Arizona as the DSH "Pool 5" program – provides supplemental Medicaid payments to hospitals that serve a disproportionate share of uninsured individuals.  *See generally* 42 C.F.R. § 412.106; Doc. 53 ¶ 27.

**C.    Relator's Allegations.**

The Court takes the factual allegations of the SAC as true for purposes of the motion to dismiss.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Relator worked for NAHC as its vice president and chief financial officer from 2004 to 2014.  Doc. 53 ¶ 8.  Since 2016, Relator has been employed as the chief financial officer of North Country HealthCare ("North Country"), a private nonprofit health center that is a tenant in a building owned by the Williams Hospital District ("WHD"), a state entity.  *Id.* ¶¶ 9, 45-46.

In July 2015, WHD asked NAHC to consider donating $3 million to WHD to fund construction of a new medical building, matching an amount WHD had collected through a tax assessment.  *Id.* ¶¶ 47-48.  NAHC declined, but in December 2015 approached WHD about pursuing a matching contribution under an IGA.  *Id.* ¶ 49; *see* A.R.S. § 11-952.

NAHC, along with FMC (a wholly-owned subsidiary of NAHC that operates a flagship hospital in the NAHC system), held discussions with WHD regarding the proposed IGA and related transactions for approximately one year.  Doc. 53 ¶¶ 11, 55.  NAHC employees involved in the discussions included chief financial officer Jeffery Treasure, director of strategic planning Susan Longfield, and NAHC employees Richard Smith and Jennifer Hidinger.  *Id.* ¶ 56.  In March 2016, NAHC and FMC prepared and submitted to AHCCCS the application form for obtaining payment from Arizona's DSH Pool 5 funds. *Id.* ¶ 57.  The application, a prerequisite to the IGA, listed Smith, Hidinger, Treasure, and Longfield as FMC contacts.  *Id* ¶¶ 58-60.  On March 24, 2016, FMC and NAHC presented a document entitled "FMC Funding Proposal Speaking Points" at a WHD board meeting. *Id.* ¶ 59.  The document stated that WHD and FMC would enter into an agreement whereby funds provided by WHD pursuant to the IGA would eventually be returned to WHD.  *Id.* ¶¶ 59, 70(a)-(d).  From April through June 2016, WHD held additional meetings to discuss updates on the agreement.  *Id.* ¶ 61.  In June 2016, NAHC formed NAHF, a nonprofit entity.  *Id.* ¶ 62.  NAHF was formed in part to facilitate the series of transactions discussed below between NAHC, FMC, and WHD.  *Id.*  Smith and Hidinger both assumed leadership roles at NAHF:  Smith as president and CEO, Hidinger as development officer.  *Id.* ¶ 56. Hidinger participated in discussions regarding the IGA on behalf of NAHF.  *Id.* ¶ 62.  Smith participated in the discussions on behalf of both NAHC and FMC.  *See id.* ¶ 69.

Discussions between Defendants and WHD concluded at the end of 2016.  *Id.* Defendants and WHD agreed to a scheme whereby WHD would transfer $2.2 million to AHCCCS pursuant to an IGA, with FMC as the designated beneficiary of the DSH Pool 5 payment that would be prompted by the transfer.  *Id.* ¶ 70(a)-(c).  Once FMC received the payment from AHCCCS – which would include matching FFP funds – FMC would make a grant to WHD through NAHF.  *Id.* ¶ 70(d).  The grant would return to WHD the original $2.2 million it had donated to AHCCCS plus a portion of the FFP that FMC had received in the DSH Pool 5 payment.  *Id.*  The leftover FFP would remain with FMC or NAHF, in which NAHC retained a reversionary interest.  *Id.*

1   Relator became aware of the scheme while working for North Country.  *Id.* ¶ 66.
2   He had previously discussed the federal prohibition on recycling of Medicaid funds with
3   Smith, who years earlier had explored whether FMC could participate in a similar
4   transaction.  *Id.* ¶ 65.  At the time, Relator told Smith that there were insufficient state and
5   local funds to legally pursue the Medicaid opportunity.  *Id.*

6   In August 2016, Relator expressed his concern about the proposed funding
7   arrangement to a North Country colleague who was present for some of the discussions
8   between Defendants and WHD, and suggested that his colleague request a "flow of funds"
9   of the transaction at the next meeting.  *Id.* ¶¶ 66-67.  The colleague did so at an August 18,
10   2016 meeting attended by NAHC, NAHF, and members of the WHD board.  *Id.* ¶ 67.
11   Hidinger responded that "we can't put anything in writing."  *Id.* ¶ 68.  Hidinger also said
12   that three months must elapse between FMC's receipt of the DSH Pool 5 funds and any
13   "Memorandum of Understanding" between WHD and NAHF.  *Id.*

14   On January 30, 2017, WHD executed an IGA with AHCCCS.  *Id.* ¶ 72; Doc. 38-1
15   at 8.[2]  The IGA contained two attachments.  *See* Doc. 38-1.  Attachment A designated FMC
16   as the "Eligible Hospital" to which WHD "agreed to transfer public funds in the amount
17   specified . . . as the Non-Federal Share of DSH payments."  *Id.* at 9.  Attachment B, entitled
18   "Agreement to Reimburse Impermissible Disproportionate Share Hospital Payments," was
19   signed by NAHC's CFO, Treasure, on behalf of FMC.  *Id.* at 10.  The agreement required
20   FMC to refund the DSH payment if it was determined that the source of the WHD funds
21   was impermissible under federal law.  *See id.*  Neither NAHC nor NAHF were parties to
22   the IGA or signatories to its attachments.  *Id.*

23   Pursuant to the IGA, WHD transferred $2.2 million to AHCCCS on February 3,
24   2017, representing that the funds constituted the non-federal share of a DSH Pool 5
25   payment to FMC.  Doc. 53 ¶¶ 70(a), 85.  On February 7, 2017, AHCCCS withdrew
26   $4,775,270.50 of FFP from the funds that CMS had made available to the State of Arizona

27   _____

28          [2]  Citations are to page numbers placed at the top of each page by the Court's
electronic filing system, not to original page numbers on the documents.

for reimbursement of Medicaid expenditures.  *Id.* ¶ 86.  AHCCCS transferred these funds, plus the $2.2 million received from WHD, to FMC, for a total DSH Pool 5 payment of $6,975,269.50.  *Id* ¶¶ 70(b)-(c), 86.  FMC then transferred $6 million to NAHF, which in turn "granted" the $6 million to WHD, in installments, as construction of the new health clinic progressed.  *Id.* ¶¶ 70(d), 101.  Relator alleges that this series of transactions had the effect of returning the original $2.2 million that WHD had provided to AHCCCS, plus an additional $3.8 million in federal matching funds.  *Id.* ¶ 101.  FMC or NAHF retained approximately $975,000.  *Id.*

On June 7, 2017, AHCCCS submitted to CMS a Quarterly Progress Report for January 1, 2017 through March 31, 2017, along with supplemental documentation.  *Id.* ¶ 87.  In the report, AHCCCS claimed an allotment of $4,775,270, representing the federal share of the February 2017 DSH Pool 5 payment to FMC.  *Id.*  The State of Arizona also claimed the February 2017 payment as a Medicaid expenditure in its quarterly Form-64, which AHCCCS certified on June 12, 2017 and subsequently submitted to CMS for approval.  *Id.* ¶ 88.  AHCCC's Form-64 package did not include the required Form 64.11 or Form 64.11A disclosures about provider-related donations.  *Id.* ¶ 89.

The SAC alleges that Defendants violated the FCA by implementing this series of transactions, which in turn caused AHCCCS to submit a false claim to the federal government – the Form-64 claiming the February 2017 DSH Pool 5 payment to FMC as a Medicaid expenditure.  *See* 31 U.S.C. § 3729(a)(1)(A).  The SAC also alleges that Defendants made, or caused to be made, several false statements in the IGA that were material to the false claim.  *See id*. § 3729(a)(1)(B).

## II.  Relevant Legal Standards.

When analyzing a complaint for failure to state a claim to relief under Rule 12(b)(6), the well-pled factual allegations are taken as true and construed in the light most favorable to the nonmoving party.  *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).  A successful motion to dismiss under Rule 12(b)(6) must show either that the complaint lacks a cognizable legal theory or fails to allege facts sufficient to support its theory.  *Balistreri*

*v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  A complaint that sets forth a cognizable legal theory will survive a motion to dismiss as long as it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Because FCA claims involve allegations of fraud, they must comply with the heightened pleading requirements of Rule 9(b).  *Cafasso ex rel. United States v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054-55 (9th Cir. 2011).  That rule requires a party alleging fraud to "state with particularity the circumstances constituting fraud[.]"  Fed. R. Civ. P. 9(b).  A "pleading must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false."  *Cafasso*, 637 F.3d at 1055 (internal quotation marks omitted).  Rule 9(b) serves dual purposes: (1) to give defendants fair notice of the allegations of fraud so they have an opportunity to rebut specific accusations, and (2) to deter the harm caused by unsubstantiated fraud complaints.  *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016).

## III.    Discussion.

Relator alleges that each Defendant violated 31 U.S.C. § 3729(a)(1)(A) and (B), which create liability for any person who "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  The elements of § 3729(a)(1)(A) and (B) are "virtually identical, with the only difference being whether Defendants submitted a false claim or made a statement material to such a claim[.]"  *McGrath v. Microsemi Corp.*, 140 F. Supp. 3d 885, 894 (D. Ariz. 2015), *aff'd*, 690 F. App'x 551 (9th Cir. 2017) (citation omitted).

The Court must interpret the FCA "broadly, in keeping with Congress's intention to reach all types of fraud, without qualification, that might result in financial loss to the Government."  *Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr.*, 953 F.3d 1108, 1116 (9th Cir. 2020) (quoting *United States v. Neifert-White Co.*, 390 U.S. 228, 232

(1968)).   As a result, FCA liability is not limited to those who present false claims to the government, but includes "any person who knowingly *assisted* in causing the government to pay claims which were grounded in fraud without regard to whether that person had direct contractual relations with the government." *United States v. Mackby*, 261 F.3d 821, 827 (9th Cir. 2001) (quoting *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 544-45 (1943)) (emphasis in *Mackby*).   A defendant may be liable if it pursues a scheme that would ultimately result in the submission of a false claim, even if the defendant did not participate in actual submission of the claim.  *See U.S. v. Bornstein*, 423 U.S. 303, 309 (1976); *Hess*, 317 U.S. at 543-45; *U.S. ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 243-44 (3d Cir. 2004).

Defendants argue that the SAC must be dismissed because the ambiguity of the statute and regulations governing provider-related donations precludes an adequate allegation of scienter under the FCA and raises due process concerns.  They also assert that the relevant statutes and regulations give the government broad powers and discretion to ensure compliance with Medicaid requirements, rendering the FCA an improper vehicle for redressing violations.  Doc. 60 at 3-7.  Finally, Defendants contend that the SAC fails to plead fraud with particularity under Rule 9(b).  *Id.* at 7.

### A.   Scienter.

To state a claim under 31 U.S.C. § 3729(a), Relator must allege that: (1) the defendant presented or caused to be presented to an agent of the United States (2) a claim for payment (3) that was false or fraudulent, (4) with knowledge that the claim was false or fraudulent and (5) falsity that was material to the government's payment decision. *United States v. Corinthian Colleges*, 655 F.3d 984, 992 (9th Cir. 2011).  The scienter requirement arises from the fact that false statements under the FCA must be made "knowingly."  31 U.S.C. § 3729(a)(1)(a)-(g).  The FCA defines "knowingly" as acting either with actual knowledge, in deliberate ignorance of the truth or falsity of the information, or in reckless disregard of the truth or falsity of the information.  *Id.* § 3729(b)(1)(A).  There is no requirement of specific intent.  *Id.* § 3729(b)(1)(B).

The SAC alleges that Defendants acted with scienter when they knowingly engaged in a fraudulent scheme to receive FFP from the government to which they were not entitled, and never committed their plan to writing because they knew it violated Medicaid regulations on non-bona fide provider-related donations.  *See generally* Doc. 53. Defendants argue that the law is ambiguous about the timing requirements of non-bona fide donations, precluding an adequate allegation of scienter.  Doc. 60 at 3-4.

Defendants appear to be referring to a statute and a regulation in particular.[3]  First, 42 U.S.C. § 1396b(w)(6)(A), disallows FFP payments when "the transferred [state] funds are *derived by the unit of government from donations* or taxes that would not otherwise be recognized as the non-Federal share under this section."  (Emphasis added.)  Second, 42 C.F.R. § 433.52(4)(1), states that "[d]onations made by a health care provider to an organization, which *in turn* donates money to the State, may be considered to be a donation made indirectly to the State by a health care provider."  (Emphasis added.)  Defendants read the statute and regulation as imposing a sequential timing requirement for impermissible provider-related donations.  Doc. 60 at 3-4.  They assert that funds transferred by WHD to AHCCCS could have been "derived" from an improper source only if the improper source first transferred the funds to WHD, and that the words "in turn" similarly suggest that the donation must have been made to WHD before it donated money to AHCCCS "in turn."  *See id.*  Because the alleged scheme in this case did not involve FMC's transfer of funds to WHD before WHD made its donation to AHCCCS, Defendants argue that it does not satisfy the sequential timing requirement in the statute and regulation and therefore could reasonably be viewed as not violating the law, precluding a plausible allegation of scienter.

The Court previously observed that the language of the statute and regulation provides some support for Defendants' argument, but that this "narrow reading would

---

[3] While Defendants' motion to dismiss (Doc. 60) does not refer specifically to the statute and regulation, it repeats Defendants' previous argument about the timing requirements in the statute and regulation and refers to the Court's previous order discussing them.  *See* Doc. 52 at 11-12.

1    allow a health care provider to pay for WHD's contribution to AHCCCS, under an
2    intentional hold harmless arrangement . . . , by the simple expedient of providing the
3    donation to WHD after the DSH funds are received rather than before."  Doc. 52 at 13.
4    Such a reading would contradict the clear intent of the statute and regulation – that a state
5    not directly or indirectly reimburse a provider for a donation – and would ignore the Ninth
6    Circuit's directive to interpret the FCA "broadly, in keeping with Congress's intention to
7    reach all types of fraud, without qualification, that might result in financial loss to the
8    Government."  *Winter*, 953 F.3d at 1116 (citation omitted).

9         The Court's previous ruling also noted that Defendants cited no case law supporting
10   their narrow reading.  Defendants now argue that the lack of case law or regulatory
11   guidance works in their favor because "the existence of a reasonable interpretation of a
12   complex statutory and regulatory scheme which supports the claim or statement submitted
13   precludes a finding of scienter under the False Claims Act."  Doc. 60 at 3.[4]

14        The Court is not persuaded by Defendants' argument.  Even if the relevant statute
15   and regulation are ambiguous, "ambiguity in the rule or regulation supposedly violated
16   does not necessarily preclude FCA liability as a matter of law."  *Gonzalez v. Planned*
17   *Parenthood of Los Angeles*, 2011 WL 1481398, at *5 (C.D. Cal. Apr. 19, 2011).

18        Defendants cite *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457 (9th Cir.
19   1999), for the proposition that a good faith interpretation of a regulation precludes liability
20   because it "forecloses the possibility that the scienter requirement is met."  *Id.* at 464.  But
21   this statement in *Parsons* was addressing a factual issue – whether the defendant actually
22   engaged in a good faith interpretation of the statute and regulations.  *Id.* at 465.  *Parsons*
23   denied summary judgment because issues of existed on the element of scienter.  *Id.* ("This
24   evidence is enough to create a genuine issue of material fact precluding summary judgment
25   on the issue of scienter.").  Such factual issues cannot, of course, be resolved on a motion

26

27        [4] The Court disagrees with Relator's assertion that the law-of-the-case doctrine bars
28   Defendants' argument.  Doc. 61 at 9.  While the Court previously addressed scienter in the
     context of specific facts alleged for specific Defendants, it did not consider whether a
     reasonable interpretation of a statute and regulation negates scienter as a matter of law.

1    to dismiss.  The Court cannot declare at this stage, as a matter of undisputed fact, that

2    Defendants acted in good faith.  *See United States ex rel. Baker v. Cmty. Health Sys.*, 2010

3    WL 11431465, at *15 (D.N.M. July 7, 2010) (assuming there was "merit to Defendants'

4    argument that the federal Medicaid regulations are unclear so as to neutralize the

5    [Relator]'s allegations of 'knowing' or 'reckless' submissions of false claims, that

6    determination may be made at a later time in the litigation, and is not appropriate for

7    consideration on a motion to dismiss[.]").

8         Defendants also rely on *United States ex rel. Krawitt v. Infosys Techs. Ltd., Inc.*,

9    372 F. Supp. 3d 1078 (N.D. Cal. 2019), where the court dismissed a case at the pleading

10   stage because the vagueness of the applicable regulations precluded a finding of scienter

11   under the FCA.  But *Krawitt* found that the defendants' subjective intent (a factual issue)

12   was irrelevant where their interpretation of the relevant statute was objectively reasonable.

13   *Id.* at 1089.  In doing so, *Krawitt* relied on *U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281

14   (D.C. Cir. 2015), which held that scienter does not exist where a defendant's interpretation

15   of a law is "objectively reasonable" and no guidance from a court of appeals or the relevant

16   agency warned the defendant away from its interpretation.  *Id.* at 288-89.

17        Even if the Court were to follow this non-binding line of authority, it could not find

18   on the present record that Defendants' interpretation of the relevant statue and regulation

19   was objectively reasonable.  As the Court explained in its previous ruling:

20        Defendants' narrow reading would allow a health care provider to pay for
21        WHD's contribution to AHCCCS, under an intentional hold harmless
         arrangement and contrary to the clear intent of the statute and regulations, by
22        the simple expedient of providing the donation to WHD after the DSH funds
         are received rather than before.  The Court cannot conclude that the law
23        permits so easy an end-run around its intent. . . .
24
25        As Defendants themselves acknowledge: "Given the restriction on non-bona
         fide provider-related donations, . . . a hospital cannot donate its own funds to
26        a public entity that the public entity donates to AHCCCS in order to obtain
         Medicaid payments for the hospital." Doc. 38 at 3. That is precisely what
27        Relator alleges happened in this case.
28

- 12 -

Doc. 52 at 13.

What is more, in *Krawitt*, the district court found that the defendants' interpretation of the relevant immigration statute was objectively reasonable because it was supported by "[n]umerous authoritative sources" including the United States Customs and Immigration Service and the Board of Immigration Appeals.  372 F. Supp. 3d at 1086-87.  *Krawitt* also found that the defendants' challenged conduct was "not inconsistent" with the legislative intent of the statute.  *Id.* at 1088.  Here, no similar authority supports Defendants' narrow reading of the statue and regulation, and the Court finds it to be inconsistent with congressional and regulatory intent.

Relator has produced government guidance that provides some support for his position.  A 2014 letter from CMS to state Medicaid directors stated that a donation is not considered bona fide where it is "tied *in any way*, directly or indirectly, to Medicaid reimbursement under the Medicaid state plan."  Doc. 38-3 at 5 (emphasis in original).  Relator alleges that the donation by WHD was not only tied to Medicaid funds, but was reimbursed entirely through Medicaid funds.

The Court cannot conclude that ambiguity in the statute or regulation precludes a finding of scienter as a matter of law.

**B.    Due Process.**

Defendants argue that imposing FCA liability in this case would violate due process, which "requires that a defendant be provided sufficiently clear notice prior to imposing penalties."  Doc. 60 at 5.  In the regulatory context, "due process requires fair notice of what conduct is prohibited before a sanction can be imposed."  *Stillwater Min. Co. v. Fed. Mine Safety & Health Review Comm'n,* 142 F.3d 1179, 1182 (9th Cir. 1998).  "To provide sufficient notice, a statute or regulation must give the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly."  *United States v. Approximately 64,695 Pounds of Shark Fins*, 520 F.3d 976, 980 (9th Cir. 2008) (internal citations and quotation marks omitted).

1    The Court finds that the statute and regulation discussed above, along with other

2    regulations and the 2014 CMS letter, could put a person of ordinary intelligence on notice

3    that the alleged scheme was improper.   And the SAC alleges facts suggesting that

4    Defendants knew the scheme was improper – Relator's alleged warning to Smith, the fact

5    that Defendants avoided putting their plans in writing, and the fact that they deliberately

6    waited three months between receipt of DSH Pool 5 funds and any agreement between

7    WHD and NAHF.  Doc. 53 ¶ 68.  The Court cannot conclude that this case presents a due

8    process problem based on lack of fair notice.  *Maynard v. Cartwright*, 108 S. Ct. 1853,

9    1857 (1988) ("Objections to vagueness under the Due Process Clause rest on the lack of

10   notice, and hence may be overcome in any specific case where reasonable persons would

11   know that their conduct is at risk."); *Lee v. Enterprise Leasing Company-West, LLC*, 30 F.

12   Supp. 3d 1002, 1012 (D. Nev. 2014) (rejecting due process challenge where "a reasonable

13   reading of the statute, in light of its legislative history and purpose, as well as the

14   interpretations thereof by relevant authorities[,]" afforded the defendants fair notice).

15          **C.      Government Discretion in Interpreting the Regulations.**

16          Defendants argue that the FCA is an inappropriate vehicle for addressing the

17   violations because the regulations already provide a remedy for impermissible donations.

18   Under 42 C.F.R. § 433.54(e), CMS can offset a non-bona fide donation by deducting the

19   donation from the state's medical assistance expenditures before calculating FFP.

20   Additionally, the IGA provides that AHCCCS will require hospitals to reimburse it, or

21   deduct future AHCCCS payments, if it determines that the funds were not public funds

22   under the federal regulations.  *See* Doc. 38-1 at 4.  Imposing FCA liability in light of these

23   remedies, Defendants contend, would "usurp impermissibly the discretion of those

24   entrusted with ensuring compliance" with the regulations.  Doc. 60 at 6 (quoting *McGrath*,

25   140 F. Supp. 3d at 904).

26          Defendants are correct that violations of discretionary regulations can, in certain

27   circumstances, preclude liability under the FCA.  *See, e.g.*, *Hagood v. Sonoma Cty. Water*

28   *Agency*, 81 F.3d 1465, 1477 (9th Cir. 1996) (statute granting the government "fairly wide

- 14 -

1    discretion" could not support a claim that a FCA defendant made a false statement),

2    *abrogated on other grounds by United States ex rel. Hartpence v. Kinetic Concepts, Inc*.,

3    792 F.3d 1121 (9th Cir. 2015).  But the two cases cited by Defendants involved regulatory

4    schemes affording the government far more discretion than the regulations in this case.  In

5    *United States v. McKesson Corp*., No. 19-cv-02233-DMR, 2020 WL 4805034, at *5 (N.D.

6    Cal. Aug. 18, 2020), relators claimed that a drug manufacturer's lax security measures

7    violated the Comprehensive Drug Abuse Prevention and Control Act of 1970 ("CSA"),

8    which, among other things, required entities to take preventative measures to guard against

9    theft of controlled substances.  *Id.* at *4.  But the CSA never specified the security measures

10   that companies needed to implement to comply with the statute.  *Id.*  Instead, it allowed the

11   government to determine whether a facility was compliant by considering 15 different

12   factors.  *Id.*  Under the statute, security measures could be deemed sufficient at some

13   facilities, but not others.  *Id.*  Because determination of a violation "turn[ed] on a regulation

14   that the government [had] broad discretion to interpret," the court found that the alleged

15   violations were not "of the kind the FCA is meant to address."  *Id.* at *5.[5]

16        *McGrath* involved a regulation promulgated under the Arms Export Control Act,

17   the administration of which was a "highly discretionary" foreign affairs function.  140 F.

18   Supp. 3d at 904.  The regulations granted the government authority to impose a wide range

19   of civil and criminal penalties, including fines and imprisonment, in the event of a

20   violation.  *Id.*  Because a "comprehensive regulatory scheme" already existed to ensure

21   compliance, the court found that imposing FCA liability would "short-circuit the very

22   remedial process the Government has established to address non-compliance with [the]

23

24   _____

25        [5] The court in *McKesson* also suggested that the CSA violations could not meet the
     materiality requirement of the FCA because they were "garden-variety" regulatory
26   violations.  2020 WL 4805034, at *5 (quoting *Universal Health Servs., Inc.  v. United
     States ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016)).  The SAC, by contrast, alleges that
27   the execution of the IGA and submission of the Form-64 – the false statements and claim
     in question – were the reason millions of dollars in matching federal Medicaid funds were
28   made available to FMC through a DSH Pool 5 payment.  *See, e.g.,* Doc. 53 ¶ 96.

regulations." *Id.* (quoting *United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 307 (3d Cir. 2011)).

None of these concerns is implicated here.  The regulations do not state that they are "highly discretionary" or otherwise provide the government with the type of "sweeping authority" that would be encroached upon by FCA liability.  *McGrath*, 140 F. Supp. 3d at 904.  On the contrary, the regulations spell out precisely which types of provider-related donations are bona fide, and detail with even greater specificity which are not.  *See* 42 C.F.R. 433.54(c)(1)-(3) (listing the three types of "hold harmless" practices).  Defendants do not cite – and the Court has not found – any provision of the regulatory scheme granting CMS broad remedial powers in the event of a violation.  *McKesson*, 2020 WL 4805034, at *4.  At most, it appears CMS is permitted to recoup funds – not impose civil or criminal penalties.  42 C.F.R § 433.54(e)*; see also id.* § 433.300 *et seq.* (statutes governing the refunding of federal Medicaid overpayments to providers).

### D.     Rule 9(b).

Defendants argue that the SAC fails to meet Rule 9(b) because it does not allege the who, what, when, where, and how of the fraudulent scheme.  Doc. 60 at 7.  The Court does not agree.

While the FAC contained details about Defendants' involvement in the alleged fraudulent scheme, it failed to identify the actual false claim, why it was false, which entity submitted the false claim, when the submission was made, and how the submission was evaluated by the federal government for materiality purposes.  Doc. 52 at 14-15.  It also never specified how Defendants submitted false claims, or otherwise assisted in some other entity's submission of a false claim.  *Id.*

The SAC remedies these deficiencies.  It identifies the false claim: the Form-64 submission to CMS seeking approval for federal funds drawn down by AHCCCS in February 2017, which contained both an affirmative false statement (the certification that "state and/or local funds" were used to match the state's allowable expenditures, and that such funds were "in accordance with all applicable federal requirements for the non-federal

- 16 -

1    share match of expenditures"), and a misleading omission (the required provider-related

2    donation disclosures in Form 64.11 and 64.11A, which should have resulted in a reduction

3    of FMC's DSH Pool 5 payment by the amount of the donation).[6]  Doc. 53 ¶¶ 85-94.

4         The SAC also identifies several false statements material to the false claim.  The

5    first is in Attachment A of the IGA, which affirmed that WHD "agreed to transfer public

6    funds in the amount specified [in the IGA] as the Non-Federal Share of DSH payments."

7    *Id.* ¶ 76.  Relator alleges that this statement was untrue because Defendants and WHD

8    knew WHD would be reimbursed for the transfer under its agreement with Defendants,

9    thus ensuring that recycled federal funds – rather than state and/or local public funds –

10   would fund the DSH payment.  *Id.* ¶¶ 81-83.  Also false was Paragraph 4.5 of the IGA,

11   providing that eligible hospitals would receive and retain one hundred percent of all DSH

12   Pool 5 payments except as required by law.  *Id.* ¶ 77.  FMC did not retain one hundred

13   percent of the DSH payment, but transferred most of it to WHD through NAHF.  *Id.* ¶ 78.

14   Finally, because Defendants' scheme violated the federal prohibition on non-bona fide

15   provider-related donations, Paragraph 7.4 of the IGA, stating that "AHCCCS, the Public

16   Entity, Eligible Hospitals, and their subcontractors must comply with all applicable Federal

17   and state laws, rules, regulations, standards and Executive Orders, without limitation to

18   those designated with this Agreement," was also an untrue representation.  *Id.* ¶ 79.

19        The SAC also ties Defendants' actions to the false statements and explains how the

20   untruths were material to the government's payment decision.  It alleges that Defendants

21   "knowingly caused" the false statements in the IGA to be made by facilitating a scheme in

22   which WHD would execute an IGA with AHCCCS under the guise of advancing public

23   state or local funds.  *Id.* ¶¶ 81-83.  It alleges that the IGA would not have been executed

24   but for the scheme, which assured WHD that its initial transfer of $2.2 million to AHCCCS

25   would be reimbursed with Medicaid funds, and allowed Defendants to benefit from the

26

27        [6] A "false or fraudulent claim" under the FCA can include misleading omissions.
     *See Escobar*, 136 S. Ct. at 1999 ("When . . . a defendant makes representations in
28   submitting a claim but omits its violations of statutory, regulatory, or contractual
     requirements, those omissions can be a basis for liability if they render the defendant's
     representations misleading with respect to the goods or services provided.").

$975,000 retained by FMC and the good publicity associated with a grant to WHD. *Id.* ¶¶ 81-83, 104. The executed IGA was the reason AHCCCS submitted the false claim and obtained matching funds from the federal government for FMC – funds that the government would have reduced had the Form-64 materials contained required disclosures about the non-bona fide provider-related donations. *Id.* ¶¶ 96-99.

Defendants claim that the SAC lacks detail about WHD's role or the individuals at WHD who participated. Doc. 60 at 8. But the SAC identifies each Defendant's role in causing the false claim and false statements to be made. NAHC conceived of the plan and proposed it to the other Defendants and WHD, all of whom agreed to play designated roles – WHD to donate funds to AHCCCS, FMC as the recipient of the DSH payment, and NAHC as the conduit of the federal funds back to WHD. *Id.* ¶¶ 96-99. The SAC does not identify specific WHD participants, but WHD is not a Defendant in this case, and the SAC provides sufficient detail about WHD's role in the scheme and its interactions with Defendants. It alleges that Defendants engaged in discussions with WHD from December 2015 through February 2017, including an August 2016 meeting where Hidinger emphasized that nothing should be put in writing. Doc. 53 ¶¶ 59, 67-68.

Defendants also argue that the SAC fails to allege particularized facts concerning the existence of a hold harmless agreement violating the prohibition on non-bona fide provider-related donations. *See* 42 C.F.R. § 433.54(c)(1)-(3) (defining hold harmless agreements). But the Court previously concluded that the FAC's hold harmless allegations were sufficient to state a claim under the FCA. *See* Doc. 52 at 13; 42 C.F.R. § 433.54(c)(2)-(3). The SAC makes the same allegations, in even greater detail.

One example suffices for the present motion. Defendants contend that "Relator fails to allege with the requisite specificity that any donation to WHD to construct its new clinic (the purported provider-related donation) was conditioned on WHD's $2.2 million donation to AHCCCS, as is required for a hold harmless practice to exist under 42 C.F.R. § 433.54(c)(3)." Doc. 60 at 9. This clearly is not correct. The scheme alleged by Relator included as essential elements WHD's $2.2 million donation to AHCCCS, which would

trigger the DSH Pool 5 payments to FMC and FMC's transfer of the DSH payments to WHD through NAHF.  Relator pleads that NAHC refused to make a donation to WHD when it asked in July 2015, and instead proposed the scheme.  Doc. 53 ¶¶ 47-49.  Relator alleges that FMC and NAHC prepared the "FMC Funding Proposal Speaking Points" document in conjunction with the March 24, 2016 WHD Board meeting, the fifth bullet point of which stated that the WHD board would enter into an agreement with FMC to ensure that the funds generated through this matching "grant" would all come back to WHD.  *Id*. ¶ 59.  Relator alleges that "but for having negotiated the scheme with WHD – and but for having agreed to participate in the fraudulent scheme as the conduit for the return of the DSH funds to WHD – the IGA would not have been executed [meaning WHD would not have donated the $2.2 million to AHCCCS] and the fraudulent recycling of federal funds would not have occurred."  *Id.* ¶ 83.  All of this allegedly was done for Defendants' benefit: "Defendants not only turned a profit at the expense of the federal government, but also received the good publicity associated with its 'grant,' all without having to donate a single dollar of its own money to the project, let alone the $3 million that WHD originally requested."  *Id.* ¶ 104.  The Court cannot dismiss the SAC for failure to allege the existence of a hold harmless arrangement with particularity.[7]

**IT IS ORDERED** that Defendants' motion to dismiss (Doc. 60) is **denied.**

Dated this 8th day of January, 2021.

David G. Campbell
Senior United States District Judge

---

[7] Citing 42 C.F.R. § 433.54(c)(1), the Court previously found that Relator had sufficiently plead the existence of a hold harmless agreement by alleging a positive correlation between FMC's direct receipt of *Medicaid* funds and its reimbursement of WHD's donation to AHCCCS.  *See* Doc. 52 at 13.  In doing so, the Court misquoted the regulation, which actually states in subpart (1) that a hold harmless arrangement exists where there is a positive correlation between the donation and a *non-Medicaid* payment to the provider of the donation.  *See* 42 C.F.R. § 433.54(c)(1).  This error does not alter the Court's conclusion in this order, however, because Relator sufficiently alleges a hold harmless arrangement at least under subpart (3) of the regulation, as discussed above.

- 19 -